1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

8

## EASTERN DISTRICT OF CALIFORNIA

9

10  DAVID ALLEN FALLS,                    )   1:08-CV-01729-OWW JMD HC
                                          )
11              Petitioner,               )   FINDING AND RECOMMENDATION
                                          )   REGARDING PETITION FOR WRIT OF
12      v.                                )   HABEAS CORPUS
                                          )
13  JAMES A. YATES,                       )   ORDER DENYING PETITIONER'S
                                          )   MOTION FOR EVIDENTIARY HEARING
14              Respondent.               )   (Doc. 66)
                                          )
15  _____       ORDER VACATING IN PART THE
                                              COURT'S PREVIOUS ORDER DIRECTING
16                                            RESPONDENT TO LODGE DOCUMENTS
                                              (Doc. 67)
17
                                              OBJECTIONS DUE WITHIN THIRTY (30)
18                                            DAYS

19
20          Petitioner David Allen Falls ("Petitioner") is a state prisoner proceeding with a petition for

21  writ of habeas corpus pursuant to 28 U.S.C. § 2254.

22                              **Procedural History**

23          On December 13, 2005, a jury convicted Petitioner of murder (Cal. Pen. Code, § 187, subd.

24  (A))[1] and was additionally convicted of being a felon in possession of a handgun (§ 12021.1) and

25  personally discharging a firearm in the commission of the murder (12022.53, subd. (d)). <u>See</u>

26  Respondent ("Resp't") Lodged 4. In a bifurcated proceeding, the trial court additionally found

27  Petitioner had two prior serious felony convictions and a prior strike and sentenced him to 100 years

28

---

[1] Unless otherwise indicated, all statutory references are to the California Penal Code.

1    to life.  See Resp't Lodged 4.

2          On May 31, 2007, in its opinion following Petitioner's direct appeal, the California Court of

3    Appeal affirmed the judgment.  See Resp't Lodged 4.

4          Petitioner filed a petition for review in the California Supreme Court on July 5, 2007.  See

5    Resp't Lodged 5.  The California Supreme Court denied the petition for review on August 8, 2007.

6    See Resp't Lodged 5.

7          Petitioner filed a petition for writ of habeas corpus in the Fresno County Superior Court on

8    October 15, 2007.  See Resp't Lodged 6.  The Superior Court denied the petition in a reasoned

9    decision on November 9, 2007.  See Resp't Lodged 7.

10         On December 18, 2007, Petitioner filed a petition for writ of habeas corpus in the California

11   Court of Appeal.  See Resp't Lodged 8.  On December 27, 2007, the Court of Appeal denied the

12   petition without comment.  See Resp't Lodged 8.

13         On January 9, 2008, Petitioner filed a petition for writ of habeas corpus in the California

14   Supreme Court.  See Resp't Lodged 9.  On June 25, 2008, the court denied the petition without

15   comment.  See Resp't Lodged 9.

16         Petitioner filed the instant petition for writ of habeas corpus in the United States District

17   Court, Eastern District of California on October 31, 2008.  Respondent filed an answer on March 19,

18   2009.[2]

19                          **Factual Background**

20         The Court adopts the California Court of Appeal's summation of the facts surrounding

21   Petitioner's crime and conviction:

22         On April 11, 2001, 14-year-old D.W. saw appellant and Jackson, both of
     whom she had seen before around her West Fresno neighborhood, across the street.
23   Appellant stood five feet away from Jackson, who was sitting on a crate on the
     sidewalk. While the two were talking, appellant "whipped out" a shotgun, fired at
24   Jackson, said "What are you going to do now, fool[,]" got into a car, and drove away.

25         D.W.'s brother, Christopher, was in the front yard when he heard loud talking

26   _____

27   [2]On January 11, 2010, the Court granted Petitioner's seventh and final request for an extension to file a traverse and ordered
     the document to be filed by February 16, 2010.  On February 19, 2010, the Court denied Petitioner's eighth motion for an
28   extension of time and ordered the traverse to be filed on or before February 26, 2010.  Petitioner did not filed a timely
     traverse to Respondent's answer.

1    across the street.  He saw Jackson sitting and appellant with a shotgun.  Christopher
2    saw appellant point the gun and fire it at Jackson.  He then saw appellant get into a car
     and drive away.

3            Rhonda Packard, who had known appellant for over 30 years and Jackson for
4    nine or ten years, was visiting her sister when she saw appellant and Jackson argue.
     Appellant left, returned later in a car, and took out a gun.  The two continued to argue,
5    and Packard yelled at appellant:  "Don't shoot that boy."  Packard then heard a loud
     noise and saw a "big white cloud of smoke come out of [Jackson's] mouth."

6            Beverly Williams lived in the neighborhood, grew up with appellant, and
7    knew Jackson.  She heard the two argue.  Appellant left and returned later.  Williams
     was inside the house when she heard a shot.  She went outside and saw appellant
8    standing on the sidewalk and Jackson lying on the ground with smoke coming out of
     his mouth.  Williams did not see a gun, but saw appellant leave in a vehicle.
9    Williams called the police.

10           Police officer Brian Valles responded to the scene and questioned Jackson,
     who was lying on the ground next to a pool of blood. Blood was coming from
11   Jackson's abdomen.  Valles asked Jackson if he knew the person who shot him, but
     Jackson claimed not to.  Valles testified that it was not unusual for victims of a west
12   side crime to refuse to identify their attacker.

13           Jackson died three days after being shot.

14   See Resp't Lodged 4 at 3.

15           The California Court of Appeal additionally summarized the case's lengthy procedural

16   background and stated in pertinent part the following:

17           The lengthy procedural history in this case extends from April 2001 to
     December 2005.  The felony complaint was filed in 2001, but appellant was not
18   arrested until July 16, 2002.  The trial court appointed the public defender to represent
     appellant and set a preliminary hearing for August 2, 2002.  On July 23, 2002,
19   however, the public defender's office declared a conflict, and Barker and Associates
     was appointed.  Thereafter, the preliminary hearing was continued several times.

20           Appellant was bound over and then arraigned on the information on October
21   18, 2002.  A trial date was set for April 21, 2003.  At the confirmation hearing 11
     days before trial was to begin, appellant filed a Marsden motion, which was denied.
22   Six days before trial was to begin, appellant argued and was granted a Faretta motion,
     and trial was continued to July 14, 2003.

23           At trial confirmation on June 19, 2003, appellant requested another
24   continuance.  He explained that he had not yet received his file from Barker and
     Associates.  Also, he had not been given timely access to the law library and had not
25   yet been given an investigator.  The motion for a continuance, however, was denied.
     Appellant made another request for a continuance on July 9, 2003, and it also was
26   denied.  On the date set for trial, no trial courts were available, and the trial date was
     trailed one day.  The following day, when appellant renewed his motion for a
27   continuance, it was granted, and trial was reset for November 10, 2003.  Trial
     confirmation was set for November 6, 2003, and a hearing date of October 15, 2003,
28   was set for a discovery motion.

On October 15, 2003, appellant requested a five-and-a-half-month continuance of trial, which was denied. The following day, appellant asked that he be relieved of his pro per status and to have counsel appointed. Barker and Associates was once again appointed to represent appellant, and his request for a continuance of trial granted until January 26, 2004.

But, in November, appellant made a request for a <u>Marsden</u> motion. On November 5, 2003, Barker and Associates attorney Scott Kinney appeared and informed the court (Judge Simpson) that appellant had filed a federal court lawsuit against Barker and Associates and had filed complaints with the California State Bar against three Barker and Associates attorneys. Kinney provided the court a copy of a United States District Court complaint file-stamped June 20, 2003. Appellant explained to the court that he had, indeed, filed a suit, through which he had sought two items of relief: that Barker and Associates turn over his file to him, and that Barker and Associates agree never to represent him again.

When the trial court suggested "it might be appropriate to consider appointing" the alternate defense office (ADO) to represent him, appellant objected. He complained of a shared ownership interest between Barker and Associates and ADO "to where if there was a conflict with one it would most likely be a conflict with both . . . ." The court continued the <u>Marsden</u> motion. On November 14, 2003, without formally granting the motion, the court relieved Barker and Associates and appointed attorney Katherine Hart to represent appellant. Judge Simpson said, during the course of the hearing:

". . . As you're aware because of comments that were made during a prior hearing or hearings leading up to today's hearing, the [ADO] is affiliated in some form or fashion, if only contractually, with the Barker and Associates Office. And because of your civil lawsuit and conflicts with the Barker's office, the [ADO], this Court has determined, probably would not represent you either. At least while they might, it's probably not the best thing in terms of the appearance of conflict, whether there's one actually or not . . . ."

Trial remained set for January 26, 2004, but appellant asked for and was granted two continuances, first to June 7, 2004, and then to July 19, 2004. Four days before the July trial date, attorney Hart requested the trial date be vacated and a disposition hearing set for the end of July. The trial date was continued to January 10, 2005.

Four days before the January trial date, appellant again requested and was granted a continuance, and the case was set for June 13, 2005. Four days before the June trial date, attorney Hart asked to be relieved. The motion was denied, as was a motion for a continuance and a <u>Faretta</u> motion.

Attorney Hart renewed her motion to withdraw on June 13, 2005, the date set for trial. As reasons for her request, she cited her "inability to work with [appellant] and to work with his sister, Beverly Brown, who has names of potential witnesses." According to Ms. Hart, Ms. Brown would not work with her and would not provide her with the names of the possible witnesses, and appellant deferred to his sister. The court again denied the motion to be relieved. Thereafter, appellant asked to file a <u>Marsden</u> motion, which was heard and denied, as was another <u>Faretta</u> motion.

On June 14, 2005, Ms. Hart filed a writ with this court, asking to be relieved as counsel for appellant. We issued a stay of appellant's trial, and subsequently granted the writ.

On September 26, 2005, the trial court (Judge Orozco) appointed the ADO as counsel for appellant and relieved Ms. Hart.  Appellant complained that ADO had not been assigned to his case before because "Barker has part ownership in ADO."  Judge Simpson, according to appellant, had "declared a conflict with Barkers and Associates, Barker has part ownership in ADO.  So ADO was a conflict also.  That's why [Ms. Hart] ended up [appointed to represent me]."  Appellant explained he had filed a suit against Barker and Associates but acknowledged the suit was no longer pending.  On the basis that the suit could no longer cause any conflict, the trial court (Judge Orozco) overruled appellant's objection to the appointment of ADO, set a status conference for October 11, 2005, and set trial for December 5, 2005.

At the status conference on October 11, 2005, again before Judge Orozco, ADO attorney Jonathan Richter (who represented appellant later, at trial) announced that his office had reviewed discovery provided and determined it had no conflict of interest.  ADO was ready to set a trial date, which Mr. Richter requested be late in January 2006.  In attempting to take appellant's continuing waiver of time, the court learned from appellant that he believed the appointment of ADO violated his rights, that he wanted to appeal that decision, and that he would neither acknowledge ADO as his counsel nor do anything to assist ADO in the task of representing him.  Without a further time waiver, the court set the matter for trial on December 5, 2005, with trial confirmation on December 1, 2005.

At the trial confirmation hearing on December 1, 2005, appellant requested a Marsden hearing, which was heard by Judge Fain, in the trial department.  At the December 5, 2005, hearing on the motion, appellant argued that Barker and Associates had "ownership" of the ADO, and that appellant had filed an earlier lawsuit against Barker and Associates, creating a conflict.  Appellant's counsel explained that Barker and Associates and the ADO were paid through a common contract with the County of Fresno, but that they had completely separate offices, attorneys, secretarial staff, investigative staff, filing and computer systems.  Following a two-day hearing, appellant's Marsden motion was denied.  Appellant then again asked that he be allowed to represent himself and said that he would need a six-month continuance.  Both the continuance and appellant's Faretta motion were denied.

Following a noon recess, appellant's counsel asked for a continuance, stating that appellant was "now . . . willing to cooperate with me" as appellant "shared with me for the first time his version of events of what happened on the evening in question" and "provided me with a list of more than half a dozen witnesses who need to be called to support his version of the events."  Defense counsel asked for a 60-day continuance to prepare.  The prosecutor objected vigorously, stating that the four-year period that had passed had already made it difficult to "hold" the witnesses together, as their "patience is gone."  After additional argument from both counsel and appellant, the trial court stated that it needed to conduct a short in camera hearing to get "more specificity in regard to the nature of the request and the time frame in regard to the witnesses and locating of these witnesses as being provided."

At the in camera hearing, out of the presence of the prosecutor, the trial court asked defense counsel about the potential witnesses appellant had revealed.  According to defense counsel, appellant asserted that there was another person, "Danny," a gang member, who was the actual shooter.  According to defense counsel, Rhonda Packard, the only major witness who would conceivably testify that she saw appellant shoot the victim, was related to Danny through marriage, which is why she would not want to identify Danny as the shooter.  Defense counsel also mentioned that Ms. Packard had an extensive history of drinking he would like to investigate.  Defense counsel informed the court that witnesses, including appellant's niece Selma

1

and his nephew Douglas, were reluctant to come forward for fear of gang retaliation and, in fact, had already been the victims of retaliation.  Defense counsel stated that

2

eyewitness Carter Anderson was currently in prison.  Defense counsel also named eyewitness Karen Carter, whom he would need time to locate, but who had previously

3

spoken to an investigator and described someone, a "half breed," as the shooter.

4

Following the in camera hearing, with the prosecutor again present, the trial

5

court stated it was concerned about both appellant's right to effective representation, and the difficulty the prosecutor had experienced in retaining witnesses.  The

6

prosecutor predicted he would not have the witnesses he now had in 60 days, especially the witnesses living in the area where the crime occurred, which continued

7

to experience significant gang and drug activity.  According to the prosecutor, "If I was in [the witnesses'] shoes . . . and every time I got a subpoena or every time a D.A.

8

investigator showed up at my door, I had to worry whether somebody was going to retaliate against me, I won't cooperate anymore."

9

After extensive comment on the difficulty of the decision, the trial court

10

denied the motion to continue.

11

A jury was thereafter empaneled to hear the case, and, on December 13, 2005, appellant was found guilty as charged.

12

See Resp't Lodged 4 at 3-8 (footnotes omitted).

13

14

## Discussion

15

**I.     Jurisdiction and Venue**

16

A person in custody pursuant to the judgment of a state court may file a petition for a writ of

17

habeas corpus in the United States district courts if the custody is in violation of the Constitution or

18

laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v.

19

Taylor, 529 U.S. 362, 375, n.7 (2000).  Venue for a habeas corpus petition challenging a conviction

20

is proper in the judicial district in which the petitioner was convicted.  28 U.S.C. § 2241(d).

21

As Petitioner asserts that he is in custody pursuant to a State conviction which violated his

22

rights under the United States Constitution, the Court has jurisdiction over this action.  28 U.S.C. §

23

2254(a).   Petitioner was convicted in Fresno County, California, which is within the Eastern District

24

of California, and thus venue is proper in the Eastern District.  28 U.S.C. § 84; 28 U.S.C. § 2241(d).

**II.     Standard of Review**

25

On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of

26

1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's

27

enactment.  Lindh v. Murphy, 521 U.S. 320, 326-27 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499

28

1   (9th Cir. 1997).  The instant petition was filed after the enactment of AEDPA and is consequently

2   governed by its provisions.  See Lockyer v. Andrade, 538 U.S. 63, 70 (2003).  Thus, the petition

3   "may be granted only if [Petitioner] demonstrates that the state court decision denying relief was

4   'contrary to, or involved an unreasonable application of, clearly established Federal law, as

5   determined by the Supreme Court of the United States.'"  Irons v. Carey, 505 F.3d 846, 850 (9th Cir.

6   2007) (quoting 28 U.S.C. § 2254(d)(1)), overruled in part on other grounds, Hayward v. Marshall,

7   603 F.3d 546, 555 (9th Cir. 2010) (en banc); see Lockyer, 538 U.S. at 70-71.

8          Title 28 of the United States Code, section 2254 remains the exclusive vehicle for

9   Petitioner's habeas petition as Petitioner is in the custody of the California Department of

10  Corrections and Rehabilitation pursuant to a state court judgment.  See Sass v. California Board of

11  Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006) overruled in part on other grounds, Hayward,

12  603 F.3d at 555.  As a threshold matter, this Court must "first decide what constitutes 'clearly

13  established Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538

14  U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal

15  law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's]

16  decisions as of the time of the relevant state-court decision."  Id. (quoting Williams, 529 U.S. at

17  412).  "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal

18  principle or principles set forth by the Supreme Court at the time the state court renders its decision."

19  Id.  Finally, this Court must consider whether the state court's decision was "contrary to, or involved

20  an unreasonable application of, clearly established Federal law."  Id. at 72 (quoting 28 U.S.C. §

21  2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

22  court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or

23  if the state court decides a case differently than [the] Court has on a set of materially

24  indistinguishable facts."  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the

25  'unreasonable application clause,' a federal habeas court may grant the writ if the state court

26  identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies

27  that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  "[A] federal court may

28  not issue the writ simply because the court concludes in its independent judgment that the relevant

state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the State court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner bears the burden of establishing that the state court's decision is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While only the Supreme Court's precedents are binding on the Arizona court, and only those precedents need be reasonably applied, we may look for guidance to circuit precedents"); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999) ("[B]ecause of the 1996 AEDPA amendments, it can no longer reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on a federal Constitutional issue. . . .  This does not mean that Ninth Circuit case law is never relevant to a habeas case after AEDPA.  Our cases may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established'").  Furthermore, the AEDPA requires that the Court give considerable deference to state court decisions.  The state court's factual findings are presumed correct.  28 U.S.C. § 2254(e)(1).  A federal habeas court is bound by a state's interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002).

The initial step in applying AEDPA's standards is to "identify the state court decision that is appropriate for our review." Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).  Where more than one State court has adjudicated Petitioner's claims, a federal habeas court analyzes the last reasoned decision. Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) for the presumption that later unexplained orders, upholding a judgment or rejecting the same claim, rests upon the same ground as the prior order).  Thus, a federal habeas court looks through ambiguous or unexplained state court decisions to the last reasoned decision to determine whether that decision was contrary to

1   or an unreasonable application of clearly established federal law.  Bailey v. Rae, 339 F.3d 1107,

2   1112-13 (9th Cir. 2003).  In the instant petition, Petitioner raised seven grounds for relief.  Petitioner

3   raised Ground One through a direct appeal to the California Court of Appeal, which affirmed the

4   judgment in a reasoned opinon.  See Resp't Lodged 4.  Petitioner's claim was then raised in a

5   petition for review to the California Supreme Court, which summarily denied review.  See Resp't

6   Lodged 5.  The California Supreme Court, by its "silent order" denying review, is presumed to have

7   denied the claims presented for the same reasons stated in the opinion of the lower court.  Ylst v.

8   Nunnemaker, 501 U.S. 797, 803 (1991).  For Ground One, the California Court of Appeal was the

9   last state court to issue a reasoned opinion; thus, the Court analyzes whether the appellate court's

10  decision is an objectively unreasonable application of federal law.  Petitioner raised Grounds Two

11  through Seven,[3] through a petition for writ of habeas corpus with the Fresno County Superior Court,

12  the California Court of Appeal and the California Supreme Court.  The California Supreme Court

13  and the California Court of Appeal issued summary denials of Petitioner's claims.  Therefore, the

14  Court "look[s] through" those decisions to the last reasoned decision; in this case, that of the Fresno

15  County Superior Court.  See Nunnemaker, 501 U.S. at 804.

16  **III.     Respondent's Affirmative Defense of Exhaustion and Procedural Default of Petitioner's
           Claims**

17

18          Respondent raises the affirmative defense of failure to exhaust state remedies for Petitioner's

    Grounds Five and Six and additionally claims Grounds Two through Four are procedurally defaulted.

19
    More specifically at to Ground Five, Respondent contends Petitioner's fourth reason or sub-

20  argument (involving his counsel's receipt of discovery), was not exhausted.  See Answer at 2.

21  Regarding Ground Six, Respondent suggests the claim was not exhausted in stating Petitioner's

22  claim "challeng[ing] the denial of his "Marsden motion was . . . not fairly presented as an

23
    independent claim" before the state court.  See Answer at 2.

24

25  _____

26  [3] Regarding the instant Petition's Ground Six (involving the denial of Petitioner's Marsden motion), the Fresno County
    Superior Court appears to have addressed the claim in that the court found the claim was procedurally defaulted.  See Resp't

27  Lodged 7.  The Superior Court stated: "The [appellate] court also noted that petitioner was not appealing the denial of his
    Marsden motions.  (Ibid.)  Therefore the petitioner cannot raise the issue now by way of a writ of petition.  (In re Clark, 5
    Cal.4th 750, 765-766 (1993))."  See Resp't Lodged 7. However, rather than suggesting the claim had been procedurally

28  defaulted, Respondent contends Petitioner failed to exhaust the claim in state court.  In either case, as we discuss below,
    because the claim is not "colorable," the Court reaches the merits of Petitioner's Ground Six.

A district court may not grant a petition for a writ of habeas corpus unless the petitioner has exhausted available state court remedies. 28 U.S.C. § 2254(b)(1).  Exhaustion of state remedies requires that a petitioner fairly present federal claims to the highest state court, either on direct appeal or through state collateral proceedings, in order to give the highest state court "the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  Duncan v. Henry, 513 U.S. 364, 365, (1995); see also Baldwin v. Reese, 541 U.S. 27, 29 (2004).[4]  However, even if a Petitioner's claims are unexhausted, an application for a writ of habeas corpus may be denied on the merits, notwithstanding the applicant's failure to exhaust available state remedies. 28 U.S .C. § 2254(b)(2); Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (finding a federal court considering a habeas petition may deny an unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable").  In the instant case, the Undersigned recommends that habeas corpus relief be denied on the merits, because it is clear that Petitioner's claims raised under both Grounds Five and Six are not colorable.

Respondent also contends that Grounds Two through Four are procedurally barred.[5] See Answer at 2, 16-17.  However resolution of the merits of these claims is also comparatively straightforward on the current record; accordingly, the Court will appropriately exercise its discretion to decide the claims on that basis.  Lambrix v. Singletary, 520 U.S. at 525, (1997); Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same").

---

[4]An applicant seeking habeas relief is required to plead their claims with considerable specificity before the state courts in order to satisfy the exhaustion requirements.  Rose v. Palmateer, 395 F.3d 1108, 1111 (9th Cir. 2005); Peterson v. Lampert, 319 F.3 1153, 1157-1159 (9th Cir. 2003); Shumway v. Payne, 223 F.3d 982, 998 (9th Cir. 2000).

[5]State courts may decline to review a claim based on a procedural default.  Wainwright v. Sykes, 433 U.S. 72, 81-82 (1977).  As a general rule, a federal habeas court " 'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.' "  Calderon v. United States District Court (Bean), 96 F.3d 1126, 1129 (9th Cir. 1996).  Even if the state rule is independent and adequate, the claims may be heard if the petitioner can show:  (1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or (2) that failure to consider the claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 749-50.  However, a reviewing court need not invariably resolve the question of procedural default prior to ruling on the merits of a claim where the issue of procedural default turns on difficult questions of state law.  Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997); Walters v. Maass, 45 F.3d 1355, 1360 n. 6 (9th Cir. 1995).

1   **IV.    Review of Petitioner's Claims**

2          The petition for writ of habeas corpus sets several grounds for relief, which all contend that

3   various rights were violated by the trial court.  Petitioner asserts the following arguments:  (1) the

4   trial court's denial of his motion for continuance violated his rights to present a defense and to the

5   effective assistance of counsel; (2) the trial court abused its discretion when appointing an attorney

6   from the Office of Alternate Defense ("ADO") because a previous judge had determined the

7   existence of an "actual" conflict of interest with the ADO; (3) the trial court violated Petitioner's

8   constitutional rights in denying Petitioner motion for self-representation on December 6, 2005; (4)

9   the trial court violated Petitioner's constitutional rights in denying Petitioner motion for self-

10  representation on April 10, 2003; (5)  he was afforded ineffective assistance of trial counsel; (6) the

11  trial court erred in denying Petitioner's Marsden motion; and (7) he was afforded ineffective

12  assistance of appellate counsel.

13         **A.     Ground One:  The Trial Court's Denial of Petitioner's Motion for Continuance**

14         In his first ground for relief, Petitioner argues that the trial court's December 6, 2005 denial

15  of his motion for continuance resulted in a violation of his constitutional rights to effective assistance

16  of counsel and to present a defense.  See Petition at 6.

17         1.     State Court Decision

18         After setting forth the applicable law, the Court of Appeal found the claim to be without

19  merit stating:

20         The appellant bears the " 'burden ... [of] ... establish[ing] an abuse of judicial
           discretion....'" (People v. Beeler (1995) 9 Cal.4th 953, 1003.)  Under this standard,
21         appellant has failed to establish good cause for a continuance and, thus, failed to
           establish an abuse of discretion.  First, appellant did not demonstrate that he had
22         exercised due diligence in apprising counsel of the potential exculpatory defense
           witnesses for trial.  "When a continuance is sought to secure attendance of a witness,
23         the defendant must establish that 'he had exercised due diligence to secure the
           witness's attendance. . . .' [Citation.]" (People v. Jenkins (2000) 22 Cal.4th 900,
24         1037.)  Although appellant claims he was understandably reluctant to talk to his ADO
           counsel prior to trial because of his prior experience with Barker and Associates, he
25         says nothing of his poor relationship and reluctance to share information with Ms.
           Hart, who represented him for over a year and a half. Before asking that she be
26         relieved of her duties, Ms. Hart complained about appellant's refusal to cooperate with
           her.  Neither does appellant acknowledge the fact that two months elapsed between
27         September 26, 2005, when Judge Orozco rejected the argument that the ADO had a
           conflict of interest precluding its representation of appellant, and December 6, 2005,
28         when appellant finally decided to cooperate with his attorney.  During that interim

period, appellant not only failed to cooperate with his attorney but also, in his refusal to do so, failed to cooperate with the court.

Second, when the reason for a continuance is to obtain the testimony of an absent witness, it is not an abuse of discretion to deny such a request in the absence of a showing that the facts to which the absent witness will testify cannot otherwise be proved (People v. Collins (1925) 195 Cal. 325, 333); that there is a reasonable probability that if the witness's testimony were produced it would affect the result of the trial (Young v. Evans (1944) 62 Cal.App.2d 365, 373); that such testimony is not merely cumulative (ibid.; People v. Fountain (1915) 170 Cal. 460, 464); and that the testimony can be obtained within a reasonable time (People v. Collins, supra, at p. 333).

Here, defense counsel stated that he had a number of witnesses he wanted to contact: appellant's niece and nephew Selma Palmer and Douglas Kendall, Carter Anderson, who was incarcerated at Wasco, and Karen Carter.  He also wanted to further investigate prosecution witness Rhonda Packard, who was related to the possible "real" shooter and who was known to have a history of drinking.

As for witnesses Selma Palmer, Douglas Kendall, and Carter Anderson, defense counsel did not indicate that he would have been able to locate these witnesses even if given more time.  Nor did he make any representation regarding the content of their testimony, other than to say Anderson was "apparently an eyewitness to what happened," or that their testimony would have been favorable to appellant.

As for Rhonda Packard, defense counsel was able to thoroughly cross-examine her at trial. During his questioning of Packard, counsel asked her about a "Danny Peña," who Packard stated was her nephew.  When defense counsel asked if Peña was actually the shooter instead of appellant, a sidebar was requested by the prosecution.  During the sidebar, the prosecution objected, stating that to specifically name Peña as the shooter at this point violated what he called "the third-party culpability evidence rule." Defense counsel stated that he was "working on securing" Karen Carter's presence, and that it would be her testimony that a "half breed," which defense counsel stated would match Peña's half Hispanic, half African-American description, was responsible for the shooting.  The trial court sustained the prosecution's objection, but stated that, if Carter were called, Packard would be subject to recall.  Subsequently it was learned, after a subpoena was issued, that the alleged eyewitness Carter, who had supposedly identified someone other than appellant as the shooter, was actually not present at the time of the shooting, but had been told by appellant's sister to say she was.

. . .

In People v. Davis (1954) 43 Cal.2d 661, 668, the defendant was arrested on April 28 and the preliminary hearing continued until May 19 due to counsel's broken leg. The defendant pled not guilty on June 22 and trial was set for July 15.  The defendant argued that the trial court erred when it denied his request for a continuance, claiming counsel was unable to adequately prepare for trial.  The Davis court disagreed, stating:

"In view of the above chronology, it cannot be said that the trial court abused its discretion in determining that counsel's injury was not such as to deny defendant effective representation by counsel. Moreover, the period from June 22 to July 15 . . . was not an unreasonably short length of time in which to prepare a defense. [Citations.]" (Id. at pp. 668-669.)

1

2          Here, too, two full months was ample time within which to prepare for trial.
       On this record, it cannot be said that appellant carried his burden to establish that the
3      denial of the continuance motion was an abuse of discretion or deprived him of
       effective assistance of counsel because counsel did not have adequate time to prepare
4      a defense.

5      See Resp't Lodged 4 at 9-12 (footnotes omitted).

6              2.       Applicable Law

7      A denial of a continuance amounts to a constitutional violation "only if there is an

8      unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for

9      delay." Morris v. Slappy, 461 U.S. 1, 11-12, (1983) ("Morris"); see also Houston v. Schomig, 533

10     F.3d 1076, 1079-1080 (9th Cir. 2008). "[B]road discretion must be granted trial courts on matters of

11     continuances." Morris, 461 U.S. at 11.

12         There are no mechanical tests for deciding when a denial of a continuance is so
       arbitrary as to violate due process. The answer must be found in the circumstances
13     present in every case, particularly in the reasons presented to the trial judge at the time
       the request is denied.

14
       Ungar v. Sarafite, 376 U.S. 575, 589 (1969).
15
       Whatever the basis of the challenge, the denial of a continuance is reviewed for abuse of
16
       discretion.  See Morris, 461 U.S. at 11-12 ("only an unreasoning and arbitrary 'insistence upon
17
       expeditiousness in the face of a justifiable request for delay' " violates a defendant's rights); Armant
18
       v. Marquez, 772 F.2d 552, 556 (9th Cir. 1985).  In Armant, the Ninth Circuit recited four factors
19
       used to determine whether the trial court abused its discretion in denying a requested continuance:
20
       (1) the degree of diligence by the petitioner prior to seeking the continuance; (2) whether the
21
       continuance would have served a useful purpose; (3) whether the continuance would have
22
       inconvenienced the court or the prosecution; and (4) the amount of prejudice suffered by the
23
       petitioner. Id. at 556-57; see also Gallego v. McDaniel, 124 F.3d 1065, 1072 (9th Cir. 1997), cert.
24
       denied, 542 U.S. 922 (1998) and 524 U.S. 917, (1998).
25

26             3.       Analysis

27     The Court of Appeal thoroughly analyzed the trial court's reasoning that rationally supported

28

U.S. District Court
E. D. California                                         13

the denial of Petitioner's request for a continuance.  Indeed, there is little analysis this Court can add to the appellate court's decision.  In sum, not only did Petitioner fail to demonstrate that he had exercised due diligence in informing his (multiple) trial counsel of the alleged exculpatory witnesses, he also failed to indicate to the trial court that he could locate the witnesses.  See Resp't Lodged 4 at 10.  As noted by the Court of Appeal, one of Petitioner's previous attorneys, Ms. Hart, who later moved to be relieved of her duties, represented Petitioner for "over a year and a half."  See Resp't Lodged 4 at 9.  According to Petitioner's statements, Petitioner was satisfied with Ms. Hart's representation and investigative efforts,[6] and yet as the Court of Appeal noted, its was Petitioner's "reluctance to share information with Ms. Hart" and his refusal to cooperate with her which ultimately led to her asking to be relieved.  See Resp't Lodged 4 at 9-10.  Thus, the record reflects that Petitioner's delay in locating his witnesses at the time of his motion, was largely a problem of his own creation.

As to Petitioner's alleged witnesses including Selma Parker, Douglas Kendall, and Carter Anderson, the Court of Appeals properly recognized that Petitioner's counsel did not indicate that these witnesses could be located or even if located that the testimony would be "favorable" to Petitioner.  See Resp't Lodged 4 at 10.  The Ninth Circuit has held that it is not an abuse of discretion to refuse to grant a continuance in order to procure an absent witness where the defendant could not demonstrate to the trial judge that he could produce the witness if the continuance was granted. See United States v. Hoyos, 573 F.2d 1111, 1114 (9th Cir. 1978) (denial of continuance proper where defendant could not demonstrate that absent witness, who had failed to appear in response to a subpoena, could be produced if the continuance was granted); United States v. Thompson, 559 F.2d 552, 553 (9th Cir. 1977) (denial of continuance proper when neither the government nor the defendant had previously been successful in producing the prospective witness and there was no reasonable assurance that the witness could be located), cert. denied, 434 U.S. 973,

---

[6]Commenting on his previous attorney's performance, Petitioner stated that Ms. Hart had done a "hell of a job."  See Transcripts for Marsden Hearing, December 5, 2005, RT at 36.

1    (1977).

2          Finally, as to Petitioner's claim that he needed more time to investigate the Prosecution's

3    witness, Rhonda Packard, the record supports the Court of Appeal's finding that Petitioner's

4    "defense counsel was able to thoroughly cross examine her at trial."  See Resp't Lodged 4 at 11; See

5    RT at 4240-4279.  Moreover, after the preliminary hearing was continued "several times" and trial

6    originally set in April of 2003, the trial court granted Petitioner's motion to continue seven times

7    over a two and one-half year period which included a five month period of time, where the Court of

8    Appeal stayed the trial, pending resolution of Petitioner's attorney's (Ms. Hart's) writ asking to be

9    relieved of counsel.  Based on this delay, the Prosecution's concern's regarding his ability to retain

10   prospective witnesses, including Ms. Packard, supported the trial court's decision to deny

11   Petitioner's motion.

12         Even assuming the trial court abused its discretion, Petitioner has not demonstrated any

13   resulting prejudice.  See Gallego v. McDaniel, 124 F.3d 1065, 1072 (9th Cir. 1977); see also Fry v.

14   Pliler, 551 U.S. 112, 121-122, (2007); California v. Roy, 519 U.S. 2, 5, (1996); Brecht v.

15   Abrahamson, 507 U.S. 619, 623 (1993).  In light of the evidence in support of the trial court's

16   decision, the denial of a continuance did not deprive Petitioner's appointed defense counsel from

17   providing a legally cognizable defense.  Accordingly, the Court has no basis for finding or

18   concluding that the Court of Appeal's determination was "objectively unreasonable."

19         **B.     Ground Two:  The trial court abused its discretion when appointing an attorney
                    from the Office of Alternate Defense**

20

21         Petitioner contends that the trial court on Septemeber 26, 2005 abused its discretion when

22   appointing an attorney from the Office of Alternate Defense because, approximately two years prior,

23   a previous judge (Judge Simpson) had already determined a "conflict of interest" existed between

24   Petitioner and the ADO.  According to Petitioner, the trial court had determined Petitioner's filing of

25   a federal lawsuit against his former counsel, Barker and Associates had created an "actual" conflict

26   of interest with Barker and Associates.  As Petitioner argued, this "actual" conflict was imputed to

27   the ADO because of the shared ownership interest between Barker and Associates and ADO.

28

1    Petitioner contends this "actual" conflict had prevented the ADO's appointment and forced the trial

2    court to appoint private counsel.  See Petition at 6.

3            As an initial matter, because Petitioner argues only that the state court erred in applying state

4    law, his claim is not cognizable on federal habeas review.  Federal courts may grant a writ of habeas

5    corpus only if the petitioner's conviction or sentence is in "violation of the Constitution or laws or

6    treaties of the United States."  28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)

7    (noting that "it is not the province of a federal habeas court to reexamine state-court determinations

8    on state-law questions"); see also Schell v. Witek, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc)

9    (noting that "not every state court abuse of discretion" amounts to a federal constitutional violation).

10   Petitioner argues only that the state court abused its discretion in appointing the ADO and was

11   offensive to the "Doctrine of Stare Decisis."  See Petition at 6.  Accordingly, his claim does not

12   warrant federal habeas relief.  See, e.g., Little v. Crawford, 449 F.3d 1075, 1082 (9th Cir. 2006)

13   (habeas petitioner's allegation that state court misapplied state law or "departed from its earlier

14   decisions" does not provide basis for habeas relief); Williams v. Borg, 139 F.3d 737, 740 (9th Cir.)

15   (Federal habeas relief is available "only for constitutional violation, not for abuse of discretion."),

16   cert. denied, 525 U.S. 937, (1998).

17           Even assuming Petitioner stated a claim for relief, his argument fails.  First, as the Court

18   discusses in detail below at Grounds Six, there is no merit to Petitioner's claim regarding the

19   existence of a "conflict of interest" at any time in the trial proceedings.  Second, Petitioner's claim

20   falsely presumes the trial court, (Judge Simpson) found that a conflict of interest existed, a fact not

21   supported by the record.  In discussing Petitioner's claimed conflict of interest, rather than finding an

22   "actual" conflict, Judge Simpson stated only that his appointment of the ADO was: "probably not the

23   best thing in terms of the appearance of conflict, whether there's one actually or not . . . ."  See Resp't

24   Lodged 4 at 5.  Petitioner's effort to recharacterize Judge Simpson's precautionary measure of

25   appointing private counsel to avoid the "appearance" of conflict lacks merit.  This position is further

26   supported by the fact that by the time the ADO was appointed in September of 2005, Petitioner's

27

28

1   lawsuit filed against Barker, (the source of the conflict), was no longer pending.  See RT at 2462.

2   Accordingly, Petitioner's claim should be denied.

3       **C.      Grounds Three and Four:  the Trial Court denial of Motions for Self-
            Representation**[7]

4

5       The Sixth Amendment affords every criminal defendant the right to self-representation.

    Faretta v. California, 422 U.S. 806, (1975).  In order to exercise this right, a defendant's request for

6   self-representation must be unequivocal.  Sandoval v. Calderon, 241 F.3d 765, 774 (9th Cir. 2000).

7   Moreover, assertion of the right must be timely and must not be for the purpose of delay.  Id. In

8   Faretta, the Supreme Court clearly established that a Faretta request made "weeks before trial" is

9   timely.  Marshall v. Taylor, 395 F.3d 1058, 1061 at n. 14 (9th Cir. 2005) (citation omitted).

10  However, the Supreme Court has not otherwise clearly established when a Faretta request is

11  untimely.  Marshall, 395 F.3d at 1061.  Accordingly, other courts are free to assess when a motion is

12  untimely so as long as their standards comport with the Supreme Court's holding that a request

13  "weeks before trial" is timely.  Marshall, 395 F.3d at 1060-61.

14          1.      April 10, 2003 Denial of Motion for Self-Representation

15      Petitioner's brought his first Faretta Motion on April 10, 2003 at 4:59 p.m.  See RT at 32-33.

16  In response, the trial court noted the late hour, stated that it was, "not in a position to accept a Faretta

17  motion," and denied Petitioner's request without prejudice.  See RT at 32-33.  The trial court advised

18  Petitioner he could renew the motion on April 21, 2010, if Petitioner still intended to pursue the

19  matter.  See RT at 33.  Following the court's suggestion, Petitioner renewed his motion on April 15,

20  2003 and the trial court granted his motion.  See RT at 329.

21      There is no merit to Petitioner's claim because after initially denying the request, the trial

22  court granted Petitioner's motion just four days later.  See RT at 329.  Petitioner has failed to

23  demonstrate any prejudice resulting from this minimal delay.

24

25

26  [7]Petitioner contends that his constitutional rights were violated when the trial court denied his request for self-representation
    on December 6, 2005 and on April 10, 2003, Grounds Three and Four respectively.

27

28

2.      December 6, 2005 Denial of Motion for Self-Representation

Following several motions to continue, trial was scheduled for December 6, 2005.  On the morning of December 6, 2005, after the trial court denied Petitioner's <u>Marsden</u> motion, Petitioner for the second time requested he represent himself and that trial be continued "at least six months" to allow him additional time to prepare.  <u>See</u> RT at 3927.  In essence, the trial court denied the motion as untimely after finding that it would not grant petitioner an additional six month continuance to prepare for trial.  <u>See</u> RT at 3927-3935.  In denying the motion, the court noted the request was made on the day of trial, the case had been pending for four years, and the "real" possibility the motion was "being made for a dilatory or delay purpose."  <u>See</u> RT at 3935.  Based on these considerations, the trial court found the "interest of justice" did not support further delay.  <u>See</u> RT at 3935.

While there is no U.S. Supreme Court case directly addressing the issue, the Ninth Circuit's opinion in <u>Marshall</u> is instructive here.  In <u>Marshall</u>, the Ninth Circuit found that the trial court's decision to deny petitioner's motion for self-representation made on the morning of trial as untimely was not objectively unreasonable.  <u>Marshall</u>, 395 F.3d at 1061.  The <u>Marshall</u> Court reasoned that because the timing of Marshall's request, made "after several continuances of his trial," fell well inside the "weeks before trial" standard for timeliness established by <u>Faretta</u>, the court of appeal's finding of untimeliness clearly comports with [United States] Supreme Court precedent.  <u>Marshall</u>, 395 F.3d at 1061-1062; <u>see also</u> <u>Stenson v. Lambert</u>, 504 F.3d 873, 882, 884 (9th Cir.2007) (holding that the trial court's decision that the <u>Faretta</u> motion made during voir dire and "on the verge of jury impanelment" was untimely was not objectively unreasonable.).

Similar to <u>Marshall</u>, this Court finds that the trial court denial of Petitioner's request for self-representation was made well inside the "weeks before trial" standard for timeliness established in <u>Faretta</u>.  <u>Marshall</u>, 395 F.3d at 1061.  Additionally, the trial court denied Petitioner's request after having granted Petitioner's motion to continue seven times over a two and one-half year period and

1  after determining that it was likely made for purposes of delay.[8]  See RT at 3935.  Under these facts,

2  the trial court properly denied Petitioner's December 6, 2005 Faretta Motion.

3      The Undersigned finds that the trial court's denial of Petitioner's Faretta Motions brought on

4  April 10, 2003 and on December 6, 2005 was not an unreasonable application of clearly established

5  Supreme Court authority.  Accordingly, Petitioner's claims raised in Grounds Three and Four should

6  be denied.

7      **D.    Grounds Five and Seven:**

8      Petitioner claims that his trial counsel was constitutionally ineffective because his counsel:

9  (1) "proceeded to trial . . . without an Affirmative Defense";  (2) failed to investigate the case; (3)

10  failed to file any pretrial motions or conduct any pretrial discovery; and (4) proceeded to trial on the

11  same day that he received informal discovery.  See Petitioner at 8.  In Ground Seven, Petitioner

12  claims his appellate counsel was constitutionally ineffective for "failure to raise all arguable claims

13  in violation of Petitioner's Sixth Amendment right to counsel . . . ."  See Petitioner at 8.

14      An allegation of ineffective assistance of counsel requires that a petitioner establish two

15  elements:  (1) counsel's performance was deficient and (2) petitioner was prejudiced by the

16  deficiency.  Strickland v. Washington, 466 U.S. 668, 687 (1984); Lowry v. Lewis, 21 F.3d 344, 346

17  (9th Cir. 1994).  Under the first element, the petitioner must establish that counsel's representation

18  fell below an objective standard of reasonableness, specifically identifying alleged acts or omissions

19  which did not fall within reasonable professional judgment considering the circumstances.

20  Strickland, 466 U.S. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).

21  Judicial scrutiny of counsel's performance is highly deferential and there exists a "strong

22  presumption that counsel's conduct [falls] within a wide range of reasonable professional assistance;

23  that is, the defendant must overcome the presumption that, under the circumstances, the challenged

24  action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 687 (quoting Michel v.

25

26  [8]Regarding Petitioner's purpose in bringing his Faretta Motion, the trial court stated: "I also think there is a real reasonable interpretation because of the history that's went on before it is being made for a dilatory or delay purpose . . . ."  See RT at 3935.

27

28

1    _Louisiana_, 350 U.S. 91, 101 (1955)); _Sanders v. Ratelle_, 21 F.3d 1446, 1456 (9th Cir. 1994).

2          Second, the petitioner must show that counsel's errors were so egregious that the petitioner

3    was deprived of the right to a fair trial, namely a trial whose result is reliable.  _Strickland_, 466 U.S. at

4    687.  To prevail on the second element, the petitioner bears the burden of establishing that there

5    exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the

6    proceeding would have been different.  A reasonable probability is a probability sufficient to

7    undermine confidence in the outcome." _Quintero-Barraza_, 78 F.3d at 1348 (quoting _Strickland_, 466

8    U.S. at 694).  A court need not determine whether counsel's performance was deficient before

9    examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. _Strickland_,

10   466 U.S. at 697.  Since prejudice is a prerequisite to a successful claim of ineffective assistance of

11   counsel, any deficiency that was not sufficiently prejudicial to the petitioner's case is fatal to an

12   ineffective assistance of counsel claim.  _Id._

13         In the last reasoned decision denying Petitioner's writ, the Fresno County Superior Court

14   stated:

15         [W]ith regard to petitioner's contentions that his trial counsel provided ineffective
           assistance, petitioner has not alleged any facts showing that his counsel's conduct fell
16         below an objective standard of reasonableness, or that petitioner's defense suffered
           any prejudice as a result of the attorney's allegedly unreasonable conduct.  (_Strickland_
17         _v. Washington_ (1984) 466 U.S. 668, 690-692.)  The alleged failure to investigate the
           case appears to have been at least partially caused by petitioner's own refusal to
18         cooperate with his attorney. . . .

19   _See_ Resp't Lodged 7.

20         Reviewing Petitioner's first three contentions regarding the lack of an affirmative defense,

21   failure to investigate, and failure to complete pretrial motions or discovery, the Undersigned agrees

22   with the Fresno Superior Court's finding that Petitioner failed to meet his burden of showing

23   prejudice.  Petitioner has not established that there exists "a reasonable probability that, but for

24   counsel's unprofessional errors, the result of the proceeding would have been different." _United_

25   _States v. Quintero-Barraza_, 78 F.3d 1344, 1348 (9th Cir. 1995) (quoting _Strickland_, 466 U.S. at 694).

26   _Id._  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  _Id._

27

28

1   Here, for each claimed failure or omission, Petitioner fails to explain what his counsel could have

2   accomplished differently to yield a different result.  For example, Petitioner argues that his counsel

3   was ineffective for proceeding to trial without an affirmative defense but provides no affirmative

4   defense which could have been raised.  See Petition at 8.  Similarly, Petitioner offers no suggestion

5   of what additional investigation, pretrial discovery, or motions could have been completed on his

6   behalf.  See Villafuerte v. Stewart, 111 F.3d 616, 632 (9th Cir. 1997) (ineffective assistance of

7   counsel claim denied where petitioner presented no evidence concerning what counsel would have

8   found had he investigated).  Thus, even, assuming defense counsel was deficient as Petitioner

9   suggests,  Petitioner has failed to demonstrate that he was prejudiced by the deficiency.  Strickland,

10  466 U.S. at 697.

11      As to Petitioner's fourth contention that prejudice resulted from his counsel proceeding to

12  trial on the same day that he received informal discovery, Petitioner does not explain either: (1)  the

13  substance of any information received in this late arriving discovery; or (2) more importantly, how

14  the delay in receiving this discovery affected his defense in any way.  Thus similar to his earlier

15  contentions, Petitioner has failed to demonstrate he was prejudiced by the claimed deficiency.

16  Strickland, 466 U.S.  at 697.  However, even ignoring these shortcomings, Petitioner's contention

17  lacks merit because, as detailed in Ground One, on the day of trial, his trial counsel sought a

18  continuance to investigate possible witnesses, however the trial court appropriately denied the

19  motion.  Therefore Petitioner's statement that his counsel failed to "protect and prevent [a] trial by

20  ambush" once he had received the informal discovery is contradicted by the record.

21      Even if Petitioner could establish that his attorney's conduct was constitutionally deficient, he

22  has not established "that there is a reasonable probability that, but for counsel's unprofessional errors,

23  the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  As the record

24  reflects, there was overwhelming evidence proving Petitioner's guilt.  See Johnson v. Baldwin, 114

25  F.3d 835, 838 (9th Cir. 1997) ("ineffective assistance claims based on a duty to investigate must be

26  considered in light of the strength of the government's case"); Bragg v. Galaza, 242 F.3d 1082,1088

27

28

1  (9th Cir. 2001).  First, Petitioner committed the crime in daylight, early in the evening of April 11,

2  2001, allowing multiple witnesses to place Petitioner at the scene.  See RT at RT 4206-07, 4209-10,

3  4226.  Second, as noted by the Court of Appeals, the record reflects that shortly before the shooting,

4  Petitioner and the victim were involved in a loud public argument where the victim challenged

5  Petitioner to "Do what you have to do."  See Resp't Lodged 4; See RT at 4232-33, 4367.  Third, two

6  out of the four on-scene witnesses, (D.W., and D.W.'s brother Christopher), were eyewitnesses to the

7  shooting and a third witness (Rhonda Packard), testified she saw Petitioner holding a "long gun"

8  shortly before she heard a "big loud boom noise."  See Resp't Lodged 4; RT 4206-07, 4217-19,

9  4234, 4375.  In light of the evidence of Petitioner's guilt, Petitioner's allegations of ineffective

10  assistance of counsel are unavailing.

11       Finally, in Ground Seven, Petitioner asserts that appellate counsel was ineffective for failing

12  to raise "all arguable claims in violation of Petitioner's Sixth Amendment right to counsel."  See

13  Petition at 8.

14       In rejecting Petitioner's claim the Fresno County Superior Court stated:

15       Furthermore, to the extent that petitioner claims that his appellate counsel rendered
         ineffective assistance when he failed to raise the above issues in the appeal, petitioner
16       has not shown that his counsel's refusal to raise the issues was unreasonable, or that
         the decision not to raise the issues on appeal caused him any actual prejudice.
17       (Strickland.v. Washington, supra, 466 U.S. at 690-692.)

18  See Resp't Lodged 7.

19       The legal standard for evaluating a claim that appellate counsel was ineffective in neglecting

20  to raise claims on appeal is that enunciated in Strickland; accordingly, a petitioner "must first show

21  that his counsel was objectively unreasonable . . . in failing to find arguable issues for appeal," and

22  then show prejudice resulting from that failure.  Smith v. Robbins, 528 U.S. 259, 285 (2000) (citing

23  Smith v. Murray, 477 U.S. 527, 535-36 (1986)).  "To be constitutionally effective, '[c]ounsel need

24  not appeal every possible question of law.'"  Turner v. Calderon, 281 F.3d 851, 872 (9th Cir. 2002) (

25  quoting Gustave v. United States, 627 F.2d 901, 906 (9th Cir. 1980)).

26

27

28

1    Here, Petitioner's claim fails to specify which of the "arguable" Sixth Amendment claims his

2    appellate counsel should have raised on direct review other than the one claim actually raised and

3    other than those claims currently before the Court.  See Petition at 8.  To the extent Petitioner is

4    referring to claims raised in the instant Petition, these claims are without merit, as discussed herein.

5    Accordingly, Petitioner can establish neither deficient performance nor prejudice from appellate

6    counsel's failure to assert such claims on direct appeal.  See Turner, 281 F.3d at 872 ("A failure to

7    raise untenable issues on appeal does not fall below the Strickland standard."); Gustave, 627 F.2d at

8    906 ("There is no requirement that an attorney appeal issues that are clearly untenable").  Therefore,

9    this claim does not warrant habeas relief.

10   Based on the discussion above, the Court finds the that the Fresno County Superior Court's

11   denial of Petitioner's ineffective assistance of counsel claims raised in Grounds Five and Seven was

12   not contrary to or an unreasonable application of federal law, as determined by the Supreme Court.

13   28 U.S.C. § 2254(d).  Accordingly, these claim should be denied.

14   **E.    Ground Six: Denial of Petitioner's Marsden Motion**

15   In Ground Six, Petitioner states that on December 6, 2005, the trial court "erroneously

16   denied" his Marsden Motion.  In support of his claim, Petitioner states he:

17       told the court why his Marsden Motion should be granted on the grounds counsel is
         not prepared for trial, nor could counsel provide effective assistance to the client
18       cause of his inadequate preparation.  When counsel spoke to the court he took on the
         role of a surrogate prosecutor against the defendant interest.

19

20       See Petition at 8.

21   Other than Petitioner's contention regarding his trial counsel's ineffectiveness, which was

22   already addressed at Ground Five, Petitioner has failed to specify any error was committed by the

23   trial court in denying the Marsden motion on December 6, 2005.  Moreover, the transcript for the

24   proceeding does not evidence anything improper.  "Conclusory allegations which are not supported

25   by a statement of specific facts do not warrant habeas relief."  James v. Borg, 24 F.3d 20, 26 (9th Cir.

26   1994).  Nevertheless, even presuming Petitioner had sufficiently supported his claim, the

27   Undersigned finds the trial court did not err in failing to appoint substitute counsel.

28

Denial of a motion pursuant to <u>People v. Marsden</u>, 2 Cal.3d 118 (1970), may implicate the Sixth Amendment right to counsel.  <u>Schell v. Witek</u>, 218 F.3d 1017, 1023 (9th Cir. 2000) (en banc). Therefore, when a criminal defendant makes a request for substitution of counsel, the trial court is constitutionally required to inquire into the defendant's reasons for wanting a new attorney.  <u>Schell</u>, 218 F.3d at 1025 ("[I]t is well established and clear that the Sixth Amendment requires on the record an appropriate inquiry into the grounds for such a motion, and that the matter be resolved on the merits before the case goes forward."); <u>see also</u> <u>Stenson v. Lambert</u>, 504 F.3d 873, 886 (9th Cir. 2007).

In reviewing a federal habeas claim based on the denial of a substitution motion, "the ultimate constitutional question the federal courts must answer" is whether the state trial court's disposition of the motion violated a petitioner's constitutional rights because the conflict between the petitioner and appointed counsel "had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment."  <u>Schell</u>, 218 F.3d at 1026.  A trial judge must also order a substitution of counsel if, after a hearing, the defendant demonstrates the existence of "an actual conflict of interest." <u>Jackson v. Ylst</u>, 921 F.2d 882, 888 (1990).  In order to obtain a reversal on the basis of a conflict of interest on appeal a defendant must establish both an actual conflict and an adverse impact on counsel's performance.  <u>Mikens v. Taylor</u>, 535 U.S. 162, 166, 172-175 (2002); <u>accord</u>, <u>People v. Cornwell</u>, 33 Cal.Rptr.3d. 1, 19-20 (Cal. 2005), overruled on other grounds.

Petitioner's <u>Marsden</u> motion was based upon basically two points: (1) an allegation of a conflict of interest; and (2) a stated lack of trust regarding his appointed counsel.

1.  Petitioner's Conflict of Interest claim.

The background of Petitioner's conflict of interest claim is as follows.  On November 5, 2003, after filing a lawsuit in federal court against his counsel and firm, Barker and Associates, Petitioner requested the trial court (Judge Simpson), appoint new counsel.  <u>See</u> Resp't Lodged 4 at 4.

1    In response to Petitioner's request, the trial court suggested appointing an attorney from the ADO's

2    office, however Petitioner objected and argued that because Barker and ADO were essentially one

3    entity, 'a conflict with one. . . would most likely be a conflict with both.'" See Resp't Lodged 4 at 4.

4    Responding to Petitioner's <u>Marsden</u> motion, Judge Simpson appointed a private attorney to represent

5    Petitioner and stated:

6         . . . As you're aware because of comments that were made during a prior hearing or
          hearings leading up to today's hearing, the [ADO] is affiliated in some form or
7         fashion, if only contractually, with the Barker and Associates Office.  And because of
          your civil lawsuit and conflicts with the Barker's office, the [ADO], this Court has
8         determined, probably would not represent you either.  At least while they might, it's
          probably not the best thing in terms of the appearance of conflict, whether there's one
9         actually or not . . . .

10   <u>See</u> Resp't Lodged 4 at 5.

11        Based on Judge Simpson's above statements, at the December 5, 2005 <u>Marsden</u> Hearing,

12   Petitioner argued Judge Simpson had determined the existence of an "actual" conflict of interest.

13   Specifically, Petitioner stated the trial court had previously determined that:  (1) an "actual" conflict

14   existed as a result of Petitioner's filing of a lawsuit against his counsel, Barker and Associates; and

15   (2) this conflict of interest extended to ADO because, a shared ownership existed between Barker

16   and ADO.  <u>See</u> Transcripts for <u>Marsden</u> Hearing, December 5, 2005, RT at 7-8.  At the <u>Marsden</u>

17   Hearing Petitioner argued that because this conflict continued, the trial court should relieve ADO as

18   his current counsel.  <u>Id.</u>  On December 6, 2005, the trial court denied Petitioner's motion <u>See</u> Resp't

19   Lodged 4 at 7.  After discussing the extensive procedural history of the case, the trial court cited to

20   the California Supreme Court's opinion in <u>People v. Hardy</u> (1992) 2 Cal.4th 86 and stated:

21        In <u>Hardy</u>, the defendant filed Federal lawsuits against counsel after two unsuccessful
          <u>Marsden</u> motions.  The <u>Hardy</u> court noted, quote, 'a patently frivolous lawsuit
22        brought by a defendant against his counsel may not alone constitute cause for
          appointment of new counsel.  Trial judges must be weary of defendants who employ
23        complaints about counsel as dilatory tactics or for some other motive.' . . .

24             . . .

25             . . . Barker and Associates and ADO are separate and distinct entities for the
          purposes of representing criminal defendants.

26             Even if they were not deemed to be so, this court wouldn't find any conflict

27

28

1    between the defendant and the agency.  I think it has been contrived by the defendant.
     I think this case – once I heard the words of Mr. Falls yesterday, I think this case is
2    extremely analogous to the <u>Hardy</u> case.

3    <u>See</u> Transcripts for <u>Marsden</u> Hearing, December 6, 2005, RT at 20-21.  The trial court's denial of his

4    request to substitute counsel was not in error as there is no merit to Petitioner's claim regarding an

5    "actual" conflict of interest.

6          As an initial matter, the record does not support Petitioner's characterization of Judge

7    Simpson's statements as finding an "actual" conflict resulting from Petitioner's federal lawsuit

8    against Barker and Associates.  As indicated by Judge Simpson statements quoted above, his

9    appointment of a private attorney was intended only as a precaution in light of his expressed concern

10   for the "appearance of [a] conflict."  However, even ignoring this pretense, Petitioner's contentions

11   regarding the existence of an "actual" conflict with ADO are unavailing.

12         As explained by the Ninth Circuit:

13         The test for determining whether the trial judge should have granted a substitution
           motion is the same as the test for determining whether an irreconcilable conflict
14         existed. The court must consider: (1) the extent of the conflict; (2) whether the trial
           judge made an appropriate inquiry into the extent of the conflict; and (3) the
15         timeliness of the motion to substitute counsel.

16   <u>Daniels v. Woodford</u>, 428 F.3d 1181, 1197-98 (9th Cir. 2005) (citations omitted).

17         Regarding the extent of the conflict, the sole source of Petitioner's conflict of interest claim,

18   was his previous lawsuit filed in 2003 against his appointed counsel from Barker and Associates.

19   However, as the California Supreme Court has recognized, not every lawsuit filed by a criminal

20   defendant against his attorney requires disqualification.  <u>People v. Horton</u>, 11 Cal.4th 1068, 1106

21   (1995).  The <u>Horton</u> Court stated:

22         [a]lthough being named as a defendant in a collateral lawsuit by one's client may
           place an attorney in a situation in which his or her loyalties are divided  (<u>People v.</u>
23         <u>Hardy</u> (1992) 2 Cal.4th 86, 136-137, 5 Cal.Rptr.2d 796, 825 P.2d 781), a criminal
           defendant's decision to file such an action against appointed counsel does not require
24         disqualification unless the circumstances demonstrate an actual conflict of interest.
           (<u>Id.</u>, at p. 137, 5 Cal.Rptr.2d 796, 825 P.2d 781.)  A contrary holding would enable an
25         indigent criminal defendant to challenge each successive appointment of counsel,
           delaying indefinitely the criminal prosecution.
26
     <u>People v. Horton</u>, 11 Cal.4th at 1106.
27

28

1    Federal Courts have similarly recognized this same point.  See Smith v. Lockhart (8th Cir.

2    1991) 923 F.2d 1314, 1321, fn. 11 ["We recognize the danger of any holding implying that

3    defendants can manufacture conflicts of interest by initiating lawsuits against their attorneys.

4    [Citation.]  A patently frivolous lawsuit brought by a defendant against his or her counsel may not,

5    alone, constitute cause for appointment of new counsel." (Italics added.) ].)

6    In addressing the determination of whether an "actual" conflict of interest exists, the United

7    States Supreme Court has stated that "trial courts necessarily rely in large measure upon the good

8    faith and good judgment of defense counsel." (Cuyler v. Sullivan (1980) 446 U.S. 335, 347;

9    Holloway v. Arkansas (1978) 435 U.S. 475, 485 (quoting State v. Davis (1973) 110 Ariz. 29, 31 and

10   stating [a] criminal defense attorney " 'is in the best position professionally and ethically to

11   determine when a conflict of interest exists or will probably develop in the course of a trial.' ".)  At

12   hearing Petitioner's counsel stated he believed that Petitioner's lawsuit with Barker and Associates

13   had not created a conflict but even assuming it had, the conflict was not imputed to the ADO's

14   office.  See Transcripts for Marsden Hearing, December 5, 2005, RT at 26.  Additionally, counsel

15   stated that he would "do as good a job as [as he could] do."  See Transcripts for Marsden Hearing,

16   December 5, 2005, RT at 43.  Petitioner's counsel's opinion that the lawsuit had not produced an

17   "actual" conflict affecting his current representation substantially undermines Petitioner's

18   contentions.

19   Additionally, the Ninth Circuit Court of Appeals decision in Foote v. Del Papa, 492 F.3d

20   1026 (2007) ("Foote") rejected a claim similar to the claim that Petitioner has raised here and the

21   Foote Court's reasoning appears dispositive.  In Foote, defendant was represented by an attorney

22   from Public Defenders Office at his arraignment in May of 2007.  Id. at 1028.  The following month,

23   Foote filed a federal lawsuit naming his attorney and the Public Defenders Office as defendants

24   alleging that his attorney had failed to "afford him" his rights provided under the constitutional.  Id.

25   at 1028.  In July 2007, in response to this lawsuit, the Public Defenders moved to withdraw as

26   counsel and the trial court granted the motion.  Id. at 1028.  Foote then retained private counsel and

27

28

in December of 1987, the federal district court dismissed Foote's action. Id. at 1028. Following trial and sentencing, the trial court re-appointed the Public Defenders Office to represent Foote in his direct appeal. Id. at 1028. In his habeas petition before the state court and later again before the federal district court, Foote raised a claim of ineffective assistance of appellate counsel based on an actual conflict of interest with the Public Defender's office as a result of his the previously dismissed federal lawsuit. Id. at 1028-29. On appeal from the district court's judgement denying his petition, the Ninth Circuit affirmed and stated:

> While we have recognized that an "irreconcilable conflict" between a criminal defendant and his trial counsel may entitle a defendant to new counsel, [citations] no Supreme Court case has held . . . that a defendant states a Sixth Amendment claim by alleging that appointed appellate counsel had a conflict of interest due to the defendant's dismissed lawsuit against the public defenders office and [previously] appointed pre-trial counsel. Foote's "conflict of interest" claim thus fails.

Id. at 1029.

Similar to Foote, no U.S. Supreme Court case has found a valid Sixth Amendment claim by alleging that appointed counsel "had a conflict of interest due to the defendant's dismissed lawsuit against the public defenders office and [previously] appointed pre-trial counsel." Foote, 492 F.3d at 1029. When there is no Supreme Court precedent that controls a legal issue raised by a habeas petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law. Wright v. Van Patten, 552 U.S. 120, 125-26, (2008) (per curiam); see also Carey v. Musladin, 549 U.S. 70, 76-77 (2006). Thus, Petitioner argument regarding a actual conflict of interest, raised at the December 5, 2005 Marsden hearing claim must fail.[9]

---

[9]Because we find that at the time of the December 2005 Marsden hearing, Petitioner has failed to demonstrate the existence of an "actual" conflict with Barker and Associates, it is not necessary to reach the question of whether any such conflict was imputed to the ADO. However the California Court of Appeal has recognized specific practices, so called "glass wall" procedures, in which Public Defenders can administer two separate offices sufficient to avoid conflicts of interest where each office represents co-defendants in the same case. See People v. Christian 41 Cal.app.4th 986 (1996). Without determining whether such safeguards extend to the factual circumstances presented here, the Undersigned notes that the testimony of Petitioner's Counsel regarding the separate management practices of the two offices suggests it was in compliance with these procedures. See RT at 3614-16.

2.  Petitioner dissatisfaction and lack of trust regarding his trial counsel's representation

The record reflects that the trial judge made a thorough inquiry not only into the source of Petitioner's alleged conflict of interest, but additionally Petitioner's claimed lack of trust with counsel.  See Transcripts for Marsden Hearing, December 5, 2005, RT at 6-45.  Testimony of both Petitioner and his trial counsel indicated that Petitioner refused to cooperate with his counsel.  Id. at 26-27, 34.  Instead, Petitioner asked his counsel to file a writ with the Court of Appeal, seeking to remove his counsel from the case due to the alleged "conflict of interest" with Barker and Associates.  Id. at 8-9,11.  Because, his counsel believed that the previously filed federal lawsuit against Barker and Associates did not create "any sort of conflict" with the ADO's office, he refused Petitioner's request but promised to work with Petitioner to continue an investigative efforts to locate witnesses favorable to Petitioner's defense.  Id. at 26-27.

Regardless of his counsel's assurances, Petitoner repeatedly indicated that he did not trust his counsel.  See Transcripts for Marsden Hearing, December 5, 2005, RT at 33, 37.  Additionally, Petitioner stated that his attorney had failed to properly investigate the case and complained that his attorney had not explained how he was going to proceed at trial or the extent of his investigation.  Id. at 9-11.  Defendant stated, "I don't see how he could have a defense prepared in this case in such a short period of time."  Id. at 9.

As set forth above, the trial court held an appropriate hearing on Petitioner's requests for substitute counsel.  At hearing the trial court allowed Petitioner to fully explain his concerns about his trial counsel and Petitioner's trial counsel responded to Petitioner's stated concerns.  Counsel explained his representation strategy, which consisted in part of moving for a continuance should Petitioner agree to cooperate, to allow time for counsel to locate any witnesses identified by Petitioner.  See Transcripts for Marsden Hearing, December 5, 2005, RT at 27-28.  Should Petitioner not cooperate and continue to refuse assistance to counsel, counsel indicated that it would be forced to prepare for trial based on the investigative efforts made to date.  Id. at 27-28.

There is also no indication that any disagreements resulted in a total lack of communication

preventing the presentation of an adequate defense.  Even if petitioner and his trial counsel had a challenging relationship, the Sixth Amendment only guarantees competent representation, not a meaningful relationship.  Morris, 461 U.S. 1, 13-14, (1983).  Petitioner's statements that he refused to cooperate with his counsel because he did not trust him are similarly unavailing.  Commenting on this claimed lack of trust the trial court stated: "defendant has not made a sustained good faith effort to work out any disagreements.  I don't think he's made any efforts at all.  The defendant has simply not given counsel an opportunity to demonstrate his trustworthiness in this case."  See Transcripts for Marsden Hearing, December 6, 2005, RT at 20.  As the Ninth Circuit Court of Appeals has recognized: ". . . no Supreme Court case . . . stands for the proposition that the Sixth Amendment is violated when a defendant is represented by a lawyer free of actual conflicts of interest, but with whom the defendant refuses to cooperate because of dislike or distrust.  Indeed, Morris v. Slappy is to the contrary." Plumlee v. Masto, 512 F.3d 1204, 1211 (2008).

After a careful review of the lodged documents, the Undersigned finds that the trial court made an adequate inquiry into petitioner's complaints and resolved the matter on the merits before proceeding with the case.  Accordingly, the trial court's handling of the motion to substitute counsel in this case passes constitutional muster and habeas relief is not available on this claim.  Schell, 218 F.3d at 1025.

**F.  Petitioner's Motion for Evidentiary Hearing**

On February 18, 2011, Petitioner filed a motion requesting the Court conduct an evidentiary hearing to resolve the merits of his underlying claims.  In Schriro v. Landrigan, 550 U.S. 465 (2007), the Supreme Court held that "(1) in deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief; (2) because the deferential standards prescribed by 28 U.S.C. § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate; and (3) if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."

1    The Court finds the Petitioner's requested hearing is unnecessary.  As discussed above, the existing

2    record is more than sufficient to resolve Petitioner's claims.[10]  Baja v. Ducharme, 187 F.3d 1075, 1078

3    (9th Cir. 1999); Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998); Villafuerte v. Stewart, 111 F.3d

4    616, 633 (9th Cir. 1997) (A petitioner's request to have a federal court hear the same evidence heard by

5    the state court in the state habeas proceeding is not a valid reason for an evidentiary hearing.); Campbell

6    v. Wood, 18 F.3d 662, 679 (9th Cir. 1994) (An evidentiary hearing is not required on issues that can be

7    resolved by reference to the state court record.).

8
9                                          **RECOMMENDATION**

10       Accordingly, the Court RECOMMENDS that:

11       1.       The petition for writ of habeas corpus be DENIED WITH PREJUDICE; and

12       2.       The Clerk of the Court be DIRECTED to enter Judgment for Respondent; and

13       3.       A Certificate of Appealability be DENIED.

14       This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United

15    States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of

16    the Local Rules of Practice for the United States District Court, Eastern District of California.

17    Within thirty (30) days after being served with a copy, any party may file written objections with the

18    court and serve a copy on all parties.  Such a document should be captioned "Objections to

19    Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and

20    filed within fourteen (14) court days after service of the objections.  The Court will then review the

21    Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c).  The parties are advised that failure to

22    file objections within the specified time may waive the right to appeal the District Court's order.

23    Martinez v. Ylst, 951 F.2d 1153 (9th Cir.1991).

24
_____

25    [10]As the Court finds the existing record is sufficient to resolve Petitioner's claims, the Court also vacates that portion of the
      Court's previous Order (Doc. 67), (Directing Respondent to Lodge Additional Transcripts), which ordered Respondent to

26    lodge Volume Six of the Reporter's Transcript (Reporter's Transcript for November 5, 2003).

27
28

**ORDER**

1.       Petitioner's request for an evidentiary hearing is DENIED; and

2.       That portion of the Court's previous Order (Doc. 67), directing Respondent to lodge Volume Six of the Reporter's Transcript (Reporter's Transcript for November 5, 2003) is VACATED.

IT IS SO ORDERED.

**Dated:    March 22, 2011**                              **/s/ Dennis L. Beck**
                                                                    UNITED STATES MAGISTRATE JUDGE